IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No.: 1:20-cv-02702-SKC

**KATELYN SCHILLER,**

      Plaintiff;

v.

**COLORADO STATE UNIVERSITY;**
**SPECTRA;**
**MICHAEL BEST;** and
**SCOTT SCHELL;**

      Defendant(s).

---

## FIRST AMENDED COMPLAINT AND JURY DEMAND

---

COMES NOW Plaintiff, by and through undersigned counsel, Baumgartner Law, L.L.C., and hereby respectfully submits this Complaint against the Defendants and allege and aver as follows:

## I.  JURISDICTION AND VENUE

1.    This action is brought pursuant to the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983; 42 U.S.C. § 1988; 20 U.S.C. § 1681-1688 (Title IX of the Education Amendments of 1972); 42 U.S.C. § 2000e (Title VII of the Civil Rights Act of 1964); and 29 U.S.C. 701 and 794 (Section 504 of the Rehabilitation Act of 1973); and Colorado State Common Law. Jurisdiction is founded upon 28 U.S.C. § 1331, §1343(a)(3) and (4), and 28.

U.S.C. §1367 (Supplemental Jurisdiction), and the aforementioned statutory and constitutional provisions.

2.       Venue is proper in the United States District Court for the District of Colorado pursuant to 28 U.S.C. §1391(b) because the Defendants are citizens and residents of Colorado, and the events, acts, and/or omissions giving rise to this action occurred in Colorado.

## II.  **PARTIES**

3.       Plaintiff, Katelyn Schiller ("Plaintiff"), is and was at all relevant times a resident of the State of Colorado residing in Fort Collins, Colorado.

4.       Defendant Colorado State University is a public university located in Fort Collins, Colorado and receives federal financial assistance within the meaning of 20 U.S.C. § 1681-1688.

5.       Defendant Spectra ("Spectra") is a Pennsylvania-based entertainment company. Spectra is principally owned by Comcast Spectacor, a Pennsylvania-based corporation licensed to transact business in the State of Colorado with its principal place of business address as 3601 South Broad Street, Philadelphia, Pennsylvania 19148. Spectra provides food and drink services to Colorado State University at its football stadium. Spectra transacts business in the State of Colorado, including providing stadium food and beverage services to Colorado State University.

6.       Defendant Michael Best ("Best") is and was at all relevant times a resident of the State of Colorado residing at 10227 Hexton Court, Lone Tree, Colorado 80124.

7.       Defendant Scott Schell ("Schell") is and was at all relevant times a resident of the State of Colorado residing at 4448 Cedarpoint Place, Highlands Ranch, Colorado 80130.

### III.   GENERAL ALLEGATIONS

8.      At the time of the incidents subject to this complaint, Plaintiff was a 19-year-old undergraduate student at Colorado State University, who was working for Spectra part time as a server at CSU football games.

9.      Spectra was operating a food and beverage company that serviced the Colorado State football stadium through a contract with Colorado State University.

10.     Ms. Schiller was assigned to serve the high-value, financially well-off patrons who watched the CSU football games from "loge boxes," which are outdoor private seating areas with controlled access. This server position was desirable because Plaintiff earned most of her income from tips, because she was able to watch the football games, and because she was able to interact with fans and successful members of the community in the loge boxes, many of whom were CSU alumni.

11.     On September 7, 2019, Plaintiff was working for Defendant Spectra as a server in a loge box that had been reserved for the season by successful CSU alumni, Defendant Michael Best, and his wife, Susie Wargin. During this and subsequent games, the couple invited friends to sit in the area to watch the games with them.

12.     During the course of the September 7, 2019 game,  Defendant Michael Best arrived at the loge box and loudly announced that he was "wasted." Ms. Schiller and other employees observed that Mr. Best was highly intoxicated.

13.     During the course of the September 7, 2019 game, Defendant Best grabbed Ms. Schiller several times, including grabbing her by the extreme upper thigh immediately adjacent to her vagina, causing her bruises. In addition, Defendant Best, who was highly intoxicated at the time

3

of this interaction, dragged Plaintiff around the box, calling her and her co-worker "bitch" on several occasions.

14.    Defendant Best's inappropriate sexual advances and physical assaults were non-consensual. His use of profanity while doing so caused Plaintiff to be intimidated and scared.

15.    Immediately after this incident, Plaintiff and her female coworker informed her supervisor Gretchin Tribken about the unwanted sexual touching, sexual harassment, name calling, and assaults that were occurring in the private seating area. Ms. Tribken told both Ms. Schiller and her coworker that the behavior was not ok. However, Ms. Tribken took no protective actions.

16.    At this time Plaintiff also learned from a coworker that Defendant Best and the guests at his loge box had committed similar acts against other young girls at football games in the past, and that no action had been taken by Defendant Spectra or Defendant CSU.

17.    On September 21, 2019, Plaintiff was again assigned to serve Defendant Best's private box. Once again, Defendant Best became highly intoxicated and again called both servers "bitch" multiple times. He also began touching Plaintiff's body in an aggressive and sexual manner close to her private parts. Defendant Best's inappropriate sexual advances and assaults were non-consensual.

18.    Plaintiff immediately notified her supervisor, Gretchin Trebkin, of the unwanted sexual touching and sexual harassment. No action was taken by Plaintiff's employer to prevent further sexual harassment by Defendant Best.

19.     However, Defendant Spectra did notify CSU Athletics Department, specifically Joe Parker, the Athletics Director. Mr. Parker walked down to Defendant Best's loge box and spoke to Defendant Best and his guests about Ms. Schiller's complaints.

20.     Mr. Parker was aware of Mr. Best's behavior, and failed to take any action to remedy the assaults or prevent future assaults from occurring.

21.     After speaking to Mr. Parker, Mr. Best immediately asked Ms. Schiller to close out his alcohol tab, which she did. When presented with bill, Mr. Best offered Ms. Schiller a separate cash tip on top of and in addition to a credit card tip, telling her that he wanted her to have a cash tip that she didn't have to share with the other servers.

22.     Ms. Schiller felt that this offer of a secret cash tip was a clear attempt to buy her silence for his mistreatment.

23.     As Ms. Schiller was closing out the tab, Mr. Best asked her several times if he was going to see her again, and if she was going to be his server for the rest of the season. He continued to touch Ms. Schiller during this interaction.

24.     On October 5, 2019, Plaintiff was once again assigned by Spectra to serve Defendant Best's private box during a CSU football game despite her repeated complaints.

25.     Before the game began, Ms. Tribken told Ms. Schiller that one of the four men from the September 21st game had been banned from the stadium, although she did not disclose his name.

26.     When Ms. Schiller began service at the loge boxes, she saw that Mr. Best was once again present.

27.     Present at this game in Defendant Best's box was Defendant Scott Schell.

5

28.     Defendant Scott Schell was also highly intoxicated at this game and immediately began touching Plaintiff in a sexual manner, caressing her hips, touching her inner thigh, putting his hands in Plaintiff's pockets and reaching his fingers into Plaintiff's pubic area directly above her vagina. In addition, Defendant Schell grabbed Plaintiff by the back of her neck and directed her around the private box.

29.     Defendant Best also continued to inappropriately touch Ms. Schiller during the game.

30.     Ms. Schiller's family attended that game, and her father witnessed the inappropriate touching of his daughter.

31.     Ms. Schiller again informed Ms. Tribken of the harassment, and Ms. Tribken told her she was going to call security. However, no security ever arrived, and Ms. Tribken apparently took no action whatsoever.

32.     Thirty minutes after Ms. Schiller made her complaint to Ms. Tribken, Mr. Schell and Mr. Wargin, who had gone missing from the box, returned to the loge box and resumed touching and rubbing her body.

33.     The physical abuse caused Ms. Schiller extreme emotional damage. At one point during the game, she retreated to the restroom and cried. Ms. Schiller's employer was aware of this.

34.     Immediately after the October 5, 2019 incidents, and during the game, Plaintiff again informed her employer, Defendant Spectra, of the unwanted sexual advances and harassment by both men. Defendant Spectra did not attempt to extricate Plaintiff from this unwanted and dangerous situation, instead allowing Defendants Best and Schell to continue groping Plaintiff throughout the rest of the October 5, 2019 football game.

35.     On October 15, Ms. Schiller attended a meeting with two Spectra supervisors, Shawn Sumstein, and Karla Lewis, the general manager. During this meeting, both Mr. Sumstein and Mr. Lewis told Ms. Schiller that the behavior she experienced was "horrendous." However, Ms. Lewis told Ms. Schiller that they could not refuse service to Mr. Best or his guests because Spectra is contracted by CSU and Mr. Best client of CSU Athletics. Ms. Lewis thereby intentionally refused to take protective actions against Mr. Best's and his guests' sexual harassment against Ms. Schiller.

36.     Mr. Lewis also told Ms. Schiller that filing a complaint with Spectra's Human Resources department would not have any effect, because the situation did not involve a Spectra employee, only a customer. In this way, Ms. Lewis also intentionally failed to take protective actions against the sexual harassment Ms. Schiller was experiencing.

37.     On October 23, 2019 Plaintiff attended a meeting with Karla Lewis, and the CSU Deputy Athletics Director, Steve Cottingham regarding the repeated sexual assaults and harassment occurring at work and on the campus of Colorado State University. This meeting was arranged by Karla Lewis and Steve Cottingham.

38.     At this meeting, Steve Cottingham repeatedly minimized the seriousness of the behavior of Defendant Best and Defendant Schell. He repeatedly challenged Ms. Schiller on the level of Defendant Best's involvement, and implied that Defendant Best's intentions could not be known.

39.     During this meeting it became clear to Ms. Schiller that Mr. Cottingham's primary goal was to advocate for and protect Defendant Best.

40.     At the end of this meeting, Ms. Schiller expressly asked for Defendant Best to be barred from the stadium to ensure no further incidents occurred.

41.     When Ms. Schiller left the October 23rd meeting, Shawn Sumstein informed her that Mr. Best and Susie Wargin were very important boosters to the CSU Athletics program, and that they had personal relationships with Joe Parker, the Athletics Director. Mr. Sumstein informed Ms. Schiller that just a few days before, Mr. Parker invited Defendant Best and Susie Wargin to be guests at his table at a boosters brunch at the stadium. Mr. Parker had already been informed of Mr. Best's assaults, but still decided to host Mr. Best and Susie Wargin at the brunch.

42.     In fact, through a Colorado Open Records Act request for information, Ms. Schiller has learned that Defendant Best's wife, Susie Wargin sent an email to CSU in which she used her friendship with the Athletics Department officers and her booster status as a means to pressure CSU Athletics to protect Defendant Best and to harm Ms. Schiller.

43.     On October 30, 2019, at 6:56 am Susie Wargin sent an email to Steve Cottingham and another Deputy Athletics Director, David Crumb, in which she expressed anger that Ms. Schiller was not removed immediately from her position due to her complaint. She went on to write, "I write a lot of checks to Athletics and the University. We have been nothing but stand up alums and supporters for decades." She continued, "I know you have a lot on your plate. We are one of many items, however we are also friends." No responsive email by Mr. Crumb or Mr. Cottingham was included in the CORA materials, nor were any notes of any telephone call between Susie Wargin and CSU Athletics after her email was sent.

44.     However, just hours later on October 30, 2019, Ms. Schiller received a text message from Karla Lewis informing her that CSU had reached a decision regarding Defendant Best.

45.     Ms. Schiller attended a second meeting that day with Steve Cottingham and Karla  Lewis. At this meeting, Ms. Schiller  learned that Steve Cottingham  and Karla Lewis had already

decided together that Spectra would continue serving alcohol to Defendant Best and his guests. In fact, Plaintiff learned that Defendant Best was going to be upgraded from a "loge box" to a Presidential Suite for future football games.

46.     At this meeting, Steve Cottingham stated to Ms. Schiller that nobody with Defendant Best's "sort of financial commitment" to the university had ever been "sanctioned" like that before.

47.     Ms. Schiller asked if Mr. Best would be allowed to return to the loge box next season, and she was informed that he likely would.

48.     After the October 30, 2019 meeting, Ms. Schiller sent an email to Defendants Spectra and CSU expressing her shock and anger not only would Defendant Best be served at games going forward, but also that he would be rewarded with an upgraded private seating area from which to watch future games.

49.     Karla Lewis responded to Ms. Schiller's email by informing her that she had discussed the situation with Steve Cottingham, and it had been decided that Ms. Schiller could continue to work for Spectra, but she would be demoted to a lesser position with significantly less ability to earn income. Specifically, she would have to work in the "pantry" stocking the items she previously served to guests and assisting servers. She would no longer interact with guests or her friends who also worked as servers, and she would no longer receive tips. This decision was made by Karla Lewis, Defendant Spectra and Steve Cottingham together.

50.     Plaintiff resigned her position with Defendant Spectra as a result of her constructive termination rather than being reassigned to a significantly lesser role where she would earn less

income. She would also have to continue to work in the same setting where her attackers would be present, and would still be consuming alcohol and roaming freely throughout the building.

51.     The decision to demote Plaintiff to a lesser position within the organization and to continue serving her attackers in the same building amounts to a constructive termination of her employment.

52.     The CSU Police Department was finally contacted by Steve Cottingham after he had consulted with Defendant Spectra, Susie Wargin, Joe Parker, and likely Defendant Best regarding the above incidents of sexual assault and harassment. A criminal investigation was initiated by the Colorado State University Police Department and Detective Sean Fitzpatrick was assigned to investigate the case.

53.     After the investigation, the criminal case was presented to the District Attorney for the Eighth Judicial District, Amanda Duhon, for a felony filing decision. The matter was screened on two separate occasions.

54.     District Attorney Duhon stated that "the SVU team unanimously felt that while we do find the victim credible and that she was subjected to unwanted sexual contact, we do not believe the case can be proven beyond a reasonable doubt if the case was filed and proceeded to trial."

55.     District Attorney Duhon stated that the reason a conviction was not likely was because there was a delay between the dates of the offense and the reporting of the incidents by CSU to the CSU Police Department.

56.     In addition, District Attorney Duhon stated that "despite the fact that the athletics department was aware of the complaint, any possible video of the incidents had not been retained." District Attorney Duhon went on to state that surveillance video footage could have

helped to secure a conviction against Defendant Best, but the evidence was destroyed by CSU Athletics, or at least not properly retained. Finally, District Attorney Duhon states that "if the incidents were reported to CSUPD promptly" by CSU Athletics, it is possible the case could have been prosecuted.

57.     Based on this statement, it is clear that CSU Athletics, in coordination with Defendant Spectra, Defendant Best, and Susie Wargin, destroyed the crucial video evidence of the assaults.

58.     As a result of the harassment, assaults, and the retaliation by Defendant Best, Ms. Wargin, Defendant Spectra, Karla Lewis, Mr. Cottingham, and Defendant CSU, Ms. Schiller had to postpone her academic pursuits, including missing classes, missing a study-abroad semester, and completion of courses. Her academic performance suffered in many ways. She had to seek psychological counseling. She has been denied other academic advancement opportunities, including an internship with the District Attorney's Office. She has experienced severe psychological distress that has manifest itself in painful physical symptoms.

## IV.   CLAIMS FOR RELIEF

### First Claim for Relief

### Violation of Title IX –  Deliberate Indifference to Sexual Harassment

### (Against Defendant CSU Athletics)

59.     Plaintiff incorporates by reference herein all preceding allegations set forth in this Complaint.

60.     Prior to filing this action, Plaintiff timely, properly and lawfully exhausted all administrative prerequisites, procedures and remedies.

11

61.     A plaintiff must allege four factors to state a claim of school district liability under Title

IX. She must allege that the district (1) had actual knowledge of, and (2) was deliberately

indifferent to (3) harassment that was so severe, pervasive, and objectively offensive that it (4)

deprived the victim of access to the educational benefits or opportunities provided by the school.

*Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1246 (10th Cir. 1999) (citing *Davis v.*

*Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 638 (1999).

62.     Title IX reaches institutions and programs that receive federal funds, 20 U.S.C. §

1681(a).

63.     Plaintiff is a student at Colorado State University. Plaintiff, as a female, is a member of a

protected class that has been historically an object of invidious discrimination.

64.     Defendant CSU, through its Deputy Athletics Directors, and through Joe Parker, since

September 7, 2019, had actual knowledge of, and were deliberately indifferent to, repeated

reports of sexual assault and harassment against Ms. Schiller by CSU booster Mike Best and his

guests.

65.     Defendant CSU's failure to take any action whatsoever at the appropriate time to stop the

ongoing sexual assault and harassment, despite their obligation to do so, was clearly

unreasonable in light of the known facts and circumstances.

66.     Plaintiff was subjected to gender-based discrimination that was so severe, pervasive and

objectively offensive that she was denied access to educational opportunities and benefits. To put

it bluntly, Defendant CSU and Steve Cottingham elected to protect and shelter boosters who

sexually assaulted one of their vulnerable young students. They did this for financial benefit.

12

67.     In addition, Defendant CSU and Mr. Cottingham's failure to preserve and/or report the incidents of sexual assault and harassment to CSU police resulted in the District Attorney's decision to not file charges against Defendant Best and Defendant Schell. Defendant CSU Athletics' decision to destroy video evidence of the assaults is a reprehensible reaction intended to shield its boosters from accountability and to allow future illegal actions against other young female students.

68.     As a direct and proximate result of Defendant CSU's deliberate indifference, Plaintiff was subjected to repeated sexual assault, sexual harassment, employment discrimination and retaliation.

69.     The sexual assault, sexual harassment, discrimination and retaliation against Plaintiff resulted in loss of academic opportunity, as set forth above, and severe and ongoing emotional distress and mental anguish to Plaintiff. This emotional distress has had serious physical manifestations and she continues to suffer from considerable anxiety and emotional distress regarding her experience, safety and well-being.

**Second Claim for Relief**

**Violation of Title IX - Retaliation for Complaint of Sex Discrimination**

**(Against Defendant CSU Athletics)**

70.     Plaintiff incorporates by reference herein all preceding allegations set forth in this Complaint.

71.     The Elements of a Title IX retaliation claim are: (1) protected participation or opposition under Title IX known by alleged retaliator; (2) action or actions disadvantaging persons engaged

13

in protected activities; and (3) causal connection between first two elements, that is, retaliatory motive playing part in adverse actions.

72.     Since September 7, 2019, Defendants have had actual knowledge of, and have been deliberately indifferent to, repeated reports of sexual assault and harassment against Plaintiff.

73.     When Plaintiff reported the sexual assault, Defendant CSU Athletics and Steve Cottingham took no protective action whatsoever.

74.     After Defendant CSU Athletics knew of the sexual assaults, it deleted the video recordings of the assaults, coordinated with Defendant Best and Susie Wargin, and Defendant Spectra to attempt to silence Plaintiff. It did not report the sexual assault to police or the District Attorney's office. Mr. Cottingham directed Defendant Spectra to demote Ms. Schiller. Mr. Cottingham also rewarded Defendant Best by giving him a Presidential Suite. Mr. Cottingham also discouraged Plaintiff from reporting multiple sexual assaults to the police. Mr. Cottingham used his position of authority at the University to intimidate Plaintiff into silence and to force her out of her position as a server. Mr. Cottingham did this for financial gain.

75.     Defendant CSU and Mr. Cottingham's retaliation was directed by Defendant Best and Susie Wargin and was a calculated attempt to silence Plaintiff.

76.     Mr. Cottingham exploited his position of trust with Plaintiff to keep her quiet and then to constructively terminate her from employment.

77.     Mr. Cottingham intentionally exploited a 19-year-old girl for the sexual gratification of financial donors to the football program. Plaintiff is just the latest victim of Defendant Best, Mr. Cottingham, and Defendant CSU.

78.     Plaintiff made complaints about the sexual assaults, and when she refused to accept Mr. Cottingham's approval of Defendant Best's groping, she was punished severely through removal and prohibition from areas of the football stadium; she was denied access to law enforcement investigation through the destruction of evidence; she was denied full access to the Title IX office through the same destruction of evidence; and she was denied of job opportunities enjoyed by other students with CSU vendors, namely Defendant Spectra.

79.     Defendant CSU's actions through Mr. Cottingham, and likely through Joe Parker as well, were intended to punish Plaintiff for complaining about sexual assaults by a financial donor.

80.     Defendants' conduct was the actual and proximate cause of Plaintiff's claimed injuries, damages and losses.

**Third Claim for Relief**

**Discrimination on the Basis of Sex in Violation of Title VII of the Civil Rights Act of 1964 –**

**Hostile Work Environment**

**(Against Defendant Spectra)**

81.     Plaintiff incorporates by reference herein all preceding allegations set forth in this Complaint.

82.     Prior to filing this action, Plaintiff timely, properly and lawfully exhausted all administrative prerequisites, procedures and remedies.

83.     To establish that a sexually hostile work environment existed, a plaintiff must prove the following elements: (1) she is a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on sex; and (4) due to the harassment's severity or

pervasiveness, the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment.

84.     Defendants Spectra and Lewis engaged in unlawful, intentional and willful discrimination against Plaintiff on the basis of sex. Defendant Best, a customer of Spectra, repeatedly sexually assaulted Plaintiff and Defendants Spectra and Lewis had actual knowledge of the harassment.

85.     Defendants failed to take any remedial or protective actions, and in fact intentionally put her back into the same situation.   Karla Lewis and Defendant Spectra knew of the sexual assaults, consulted with Defendant CSU Athletics, and then intentionally offered Plaintiff up to Defendant Best and his rich friends for more sexual assault and harassment.

86.     At the time that Defendants Spectra and Lewis engaged in discriminatory actions against Plaintiff, Plaintiff was a member of a Title VII protected class because she is a woman. Defendants were aware that Plaintiff was a member of a protected class at the time that she was hired.

87.     The harassment experienced by Plaintiff was so severe and pervasive that it altered a term of her employment and created an abusive working environment.

88.     Defendants' conduct was the actual and proximate cause of Plaintiff's claimed injuries, damages and losses.

### Fourth Claim for Relief

### Violation of Title VII of the Civil Rights Act of 1964 – Retaliation

### (Against Defendant Spectra)

89.     Plaintiff incorporates by reference herein all preceding allegations set forth in this Complaint.

90.     Prior to filing this action, Plaintiff timely, properly and lawfully exhausted all administrative prerequisites, procedures and remedies.

91.     The elements of a claim for retaliation under Title VII are that (1) the employee engaged in protected opposition to discrimination, (2) the employee suffered an adverse employment action during or after the protected opposition that a reasonable employee would have found materially adverse, and (3) a causal connection between the protected activity and the materially adverse action.

92.     Plaintiff engaged in protected activity when she complained about the sexual harassment by a customer, Defendant Best.

93.     Thereafter, Defendant Spectra took an adverse employment action against Plaintiff by assigning her to a less desirable position in which she made less money.

94.     Defendant Spectra took this action in direct response to Plaintiff's complaint and for the purpose of maintaining their financial relationship with CSU and Defendant Best.

95.     As a direct proximate cause of this retaliation, Plaintiff suffered losses and damages as set forth above.

## Fifth Claim for Relief

### Assault and Battery – Colorado State Cause of Action

### (Against Defendant Best and Defendant Schell)

96.     Plaintiff incorporates by reference herein all preceding allegations set forth in this Complaint.

97.     The elements for a civil cause of action for assault and battery are (1) the defendant intended to cause an offensive or harmful physical contact with the plaintiff or intended to place the plaintiff in apprehension of such contact, (2) the plaintiff was placed in apprehension of an imminent contact with her person by the conduct of the defendant, and (3) a harmful or offensive contact with the plaintiff actually occurred.

98.     Since September 7, 2019, September 21, and October 5, 2019, Defendant Best engaged in a pattern of sexual assault and harassment, including aggressive physical touching on or near Plaintiff's private body parts and threatening verbal statements and harassment. On October 5, Defendant Schell engaged in a pattern of sexual assault and harassment, including aggressive physical touching on or near Plaintiff's private body parts and threatening verbal statements and harassment.

99.     During these incidents, Defendants Best and Schell intended to cause harmful physical contact with Plaintiff and actually did cause harmful physical contact with Plaintiff.

100.    In addition, Defendants Best and Schell intended to place Plaintiff in fear of offensive or harmful physical contact during these incidents.

101.    As a direct and proximate result of Defendants' actions, Plaintiff has suffered damages in the form of past, present and future emotional distress, humiliation, embarrassment, and great

mental and physical pain and suffering. Plaintiff also suffered damages in the form of loss of income, and past, present and future medical expenses.

### Sixth Claim for Relief

**(Sexual Assault – Against Defendant Best and Defendant Schell)**

102.    Plaintiff incorporates by reference herein all preceding allegations set forth in this Complaint.

103.    The elements of Colorado State law cause of action for Sexual Assault are the same as Assault and Battery, except that there is a six-year statute of limitations for sexual assault.

104.    Since September 7, 2019, September 21, and October 5, 2019, Defendant Best engaged in a pattern of sexual assault and harassment, including aggressive physical touching on or near Plaintiff's private body parts and threatening verbal statements and harassment. On October 5, Defendant Schell engaged in a pattern of sexual assault and harassment, including aggressive physical touching on or near Plaintiff's private body parts and threatening verbal statements and harassment.

105.    During these incidents, Defendants Best and Schell intended to cause harmful physical contact of a sexual nature with Plaintiff and actually did cause harmful physical contact of a sexual nature with Plaintiff.

106.    In addition, Defendants Best and Schell intended to place Plaintiff in fear of offensive or harmful physical contact of a sexual nature during these incidents.

107.    As a direct and proximate result of Defendants' actions, Plaintiff has suffered damages in the form of past, present and future emotional distress, humiliation, embarrassment, and great

mental and physical pain and suffering. Plaintiff also suffered damages in the form of loss of income, and past, present and future medical expenses.

Dated this 15th day of September, 2020.

Respectfully submitted,
BAUMGARTNER LAW, LLC


 *s/ S. Birk Baumgartner*
S. Birk Baumgartner, #47829
Sean M. Simeson, #47675
300 E. Hampden Ave, Ste. 401
Englewood, CO 80013
Phone: (720) 626-9418
Email: birk@baumgartnerlaw.com
Email: sean@baumgartnerlaw.com
*Attorneys for Plaintiff*